**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | |
|---|---|
| JOHN GLATT, SONJI GRANDY, HEATHER BALL, DASHAWN HUNTER, and MICHAEL CORONA as individuals and as representatives of the classes,<br><br>      Plaintiffs,<br><br>  v.<br><br>MARK CURRY, AMERICAN WEB LOAN, INC., AWL, INC., RED STONE, INC., MEDLEY OPPORTUNITY FUND II LP, and MEDLEY CAPITAL CORPORATION,<br><br>      Defendants. | Case No.   4:18cv101<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs, John Glatt, Sonji Grandy, Heather Ball, Dashawn Hunter, and Michael Corona *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendants, allege as follows:

### GENERAL ALLEGATIONS

1.      This is a case about a scheme to make online usurious short terms loans (commonly called "payday loans"). These loans carry triple-digit interest rates, often exceeding 400%, and are illegal.

2.      Payday loans target vulnerable borrowers and, left unregulated, can economically devastate borrowers and their communities. Consumers often renew the loans or take out new loans when they are unable to pay their original loans off, creating a cycle of mounting debt.

1

3.     In recent years, payday lenders have concocted various schemes to make high-interest loans over the internet while avoiding state usury laws.

4.     In one scheme—the so-called "rent-a-bank" strategy—payday lenders convinced banks headquartered in states with high (or nonexistent) usury limits to form a lending venture in order to capitalize on the fact that the bank was obligated to comply only with the usury law of its home state, even for loans made elsewhere.

5.     Federal banking regulators shut down these "rent-a-bank" schemes. Michael A. Stegman, *Payday Lending*, 21 JOURNAL OF ECONOMIC PERSPECTIVES 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

6.     Some payday lenders have since developed a new method to attempt to avoid state usury laws—the "rent-a-tribe" scheme.

7.     In a rent-a-tribe scheme, the payday lender—which does most of its lending over the internet—affiliates with a Native American tribe to attempt to insulate itself from federal and state law by piggy-backing on the tribe's sovereign legal status and its general immunity from suit under federal and state laws. Using this doctrine, lenders argue that because their businesses are located on a Native American reservation or affiliated with a Native American tribe, they are bound by the laws of that reservation or tribe only, not federal or state law. *See* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 WASH. & LEE L. REV. 751, 759 (2012).

8.     Like its predecessors, this scheme is doomed to fail, because even a cursory examination of the underlying relationship between the payday lender and the tribe demonstrates that the relationship is insufficient to permit the lender to avail itself of the tribe's immunity.

9.      Rent-a-tribe schemes are not designed to promote tribal business but instead are contrivances aimed at avoiding state and federal law, with the vast majority of the revenues going to non-tribal entities.

10.     In recent years, these rent-a-tribe schemes have come under increasing scrutiny from courts and regulators. Two prominent perpetrators were recently convicted and sentenced to prison for their role.[1]

11.     This case is about one such rent-a-tribe scheme. In this case, non-tribal member Mark Curry, through his companies including the MacFarlane Group provided the capital, marketing, underwriting, and other resources for American Web Loan, Inc. ("American Web Loan") and Red Stone, Inc., entities owned by the Otoe-Missouria Tribe for the sole purpose of making illegal loans and avoiding state and federal law through the artifice of immunity created by the rent-a-tribe scheme. The Medley Capital Corporation and the Medley Opportunity II, L.P. provided the funding to make the high-interest loans through American Web Loan.

12.     Plaintiffs, on behalf of themselves and the Classes set forth below, seek to recover damages and penalties under state and federal law for Defendants' illegal and usurious loans.

## JURISDICTION AND VENUE

13.     The Court has original jurisdiction over Plaintiffs' Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1965 and 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

---

[1] See The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday;   The   United   States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

14.     The Court also has jurisdiction under the Class Action Fairness Act because Plaintiffs are citizens of Virginia, Illinois, New Jersey, and Pennsylvania, at least one defendant is not a citizen of any of those states, the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

15.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District. Venue is also proper in this Court pursuant to 18 U.S.C. § 1965(a) because a civil action may be brought in "any district" where a person "resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). Defendants have transacted their affairs in this District through the nationwide scheme, which collected millions of dollars from Virginia consumers. As part of their scheme, Defendants solicited Virginia consumers with direct mails, debited Virginia consumers' bank accounts, and serviced the illegal loans of thousands of Virginia consumers.

## PARTIES

16.     Plaintiff John Glatt is a natural person who resides in Henrico, Virginia.

17.     Plaintiff Sonji Grandy is a natural person who resides in New Jersey.

18.     Plaintiff Heather Ball is a natural person who resides in New Jersey.

19.     Plaintiff Dashawn Hunter is a natural person who resides in Illinois.

20.     Plaintiff Michael Corona is a natural person who resides in Pennsylvania.

21.     Defendant Mark Curry is a natural person and resident of Puerto Rico.  Curry was the founder and chief executive officer of the MacFarlane Group, which he created to make and collect usurious loans. As explained below, Curry was the architect of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise.

4

22.     Defendant American Web Loan, Inc. is a purported tribal entity incorporated under the laws of the Otoe-Missouria Tribe of Indians ("the Tribe"). American Web Loan operates a business as an internet lending website under the domain name www.americanwebloan.com. In return for a small fraction of the revenue, the Tribe allowed the lending scheme to use its name and falsely claim that it is operated by the Tribe. At all times relevant hereto, the Tribe did not participate in the day-to-day operations of American Web Loan and did not fund the loans or handle the servicing or collection of the loans.

23.     Defendant AWL, Inc. ("AWL") is a corporation formed under the laws of the Tribe. AWL is a special purpose corporation formed to allow non-tribal members to hold a security interest in AWL. According to a District of Columbia UCC filing, three entities hold a security interest in the assets of Defendant AWL, Inc. (excluding certain tribal trust property and equity interests in tribal entities): First Infinity Holdings, Inc. (Attn: Mark Curry); First Mountain Holdings, Inc. (Attn: Mark Curry); and First CM Holdings, Inc. (Attn: Mark Curry).

24.     Defendant Red Stone, Inc., is a corporation formed under the laws of the Tribe. Curry sold the MacFarlane Group to Red Stone in an attempt to shield the MacFarlane Group's illegal lending practices. Red Stone is the surviving entity of the merger between Red Stone and the MacFarlane Group.

25.     Defendants Medley Opportunity Fund II, LP ("Medley Fund") and its corporate parent and controlling entity Medley Capital Corporation ("Medley Capital") are entities formed under Delaware law and are based in New York City.  The Medley Defendants provided the capital to fund the illegal loans at issue here and in turn reaped profits from the illegal interest and fees received from those loans.

## SERVICE ON THE ATTORNEY GENERAL

26.     Counsel for Plaintiffs are causing a copy of this pleading to be served contemporaneously on the Attorney General of Illinois in accordance with 815 ILCS 505/10a(d).

## STATE USURY AND CONSUMER PROTECTION LAWS[2]

### A. Virginia

27.     Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984). The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972).

28.     In accordance with this longstanding public policy, Virginia's Consumer Finance Act prohibits a person from charging an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A). The consumer finance licensing requirements are designed to protect Virginia consumers from predatory lenders like Defendants.

29.     The Virginia General Assembly has expressly declared that any attempt to circumvent usury laws is "against public policy and void." Va. Code. § 6.2-306(A) ("Any agreement or contract in which the borrower waives the benefits of this chapter or releases any rights he may have acquired under this chapter shall be deemed to be against public policy and

---

[2] Usury laws are not unique to the United State of America. Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin." Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012). Echoing these sentiments, Pope Francis recently explained that "Usury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country." Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

void."). This includes attempts to evade the application "by any device, subterfuge, or pretense whatsoever," including "procurement of a loan through any use or activity of a third person, whether real or fictitious." Va. Code. § 6.2-1541(C).

30.     Any loan made in violation of Virginia's usury laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made." Va. Code § 6.2-1541(A)-(B).

**B.  New Jersey**

31.     The maximum interest rate chargeable to consumers under New Jersey law is 16%. N.J. Stat. § 31:1-1(a). Charging consumers a rate of interest greater than 30% is a criminal act under New Jersey law. N.J. Stat. § 2C:21-19.

32.     The New Jersey Consumer Finance Licensing Act ("CFLA") governs the provision of installment loans to consumer in New Jersey and allows *licensed* lenders to charge interest higher than 16% for installment loans under $50,000.  N.J. Stat. §§ 17:11C-1 to 17:11C-49

33.     The CFLA provides that anyone engaged in business as a consumer lender who is not licensed is "guilty of a crime of the fourth degree." N.J. Stat. § 17:11C-33(b). The act further provides that loans made by unlicensed lenders "shall be void and the lender shall have no right to collect or receive any principal, interest or charges unless the act was the result of a good faith error...." *Id.*

34.     Defendants were never licensed to make consumer loans in New Jersey.

35.     The New Jersey Consumer Fraud Act also provides a remedy for consumers who are the victims of unfair or deceptive acts or practices in trade or commerce.  N.J. Stat. § 56:8-2.

**C.      Illinois**

36.     Under the Illinois Consumer Installment Loan Act, a "'[s]mall consumer loan'" means a loan upon which interest is charged at an annual percentage rate exceeding 36% and with an amount financed of $4,000 or less.  205 ILCS 670/15.

37.     Small consumer loan lenders are required to be licensed to make loans.  205 ILCS 670/1.  A licensed lender may charge interest rates up to 99%.  *See* 205 ILCS 670/17.2(a)(1), (b)(3)).

38.     If a lender is licensed, annual interest is capped at 9%: "[I]n all written contracts it shall be lawful for the parties to stipulate or agree [to] 9% per annum, or any less sum of interest." *See* 815 ILCS 205/4(1).

39.     If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan." 205 ILCS 670/20(d).

40.     Through a civil action, a borrower can sue a lender for violating the Illinois Consumer Installment Loan Act "prior to the expiration of 2 years after the date of his last scheduled payment" to reduce the balance by the amount that the lender is entitled to recover, and to recover attorneys' fees and costs.  205 ILCS 670/20(b); 205 ILCS 670/20.7.The Illinois Consumer Fraud Act also provides a remedy for consumers who are the victims of unfair or deceptive acts or practices in trade or commerce. 815 ILCS 505/2; 815 ILCS 550/10a.

**D.      Pennsylvania**

41.     Under Section 201 of the Loan Interest and Protection Law ("LIPL"), 41 Pa. Stat. § 201, the maximum lawful rate of interest for the loan use of money in amounts less than $50,000 is six percent (6%) per year.

42.     The six-percent interest cap applies to all consumer lenders except those lenders who are licensed under the Consumer Discount Company Act ("CDCA"), 7 Pa. Stat. §§ 6201 *et seq.*, and who make loans in accordance with the limitations and requirements of that statute. *See Pennsylvania Dep't of Banking v. NCAS of Delaware, LLC*, 948 A.2d 752 (Pa. 2008). This cap applies to all credit-related charges, however labeled, and applies to credit lines as well as fixed-amount loans. *Id.* at 762.

43.     Starting on February 1, 2009, the usury restrictions imposed by the LIPL and the CDCA apply to loans made over the internet. *See Cash America Net of Nevada, LLC v. Comm'r, Dep't of Banking*, 8 A.3d 282 (Pa. 2010) (upholding the Department of Banking's official interpretation).

44.     As a result, since February 1, 2009, payday lending—the "consumer lending practice in which a lender offers consumers high-rate, short-term loans secured by either a post-dated check or a debit authorization from a bank," *id.* at 284—has been illegal in Pennsylvania, whether done through storefronts or over the internet.

45.     On information and belief, Defendants are not licensed under the CDCA, and thus are prohibited from making and collecting on any consumer loans to Pennsylvania citizens that charge interest rates in excess of six percent per year.

## DEFENDANTS' SCHEME TO AVOID STATE USURY AND CONSUMER PROTECTION LAWS

46.     Defendants operate a rent-a-tribe scheme that charges more than 400% annual interest on short term loans.

47.     The architect of the scheme is Mark Curry, a Chicago entrepreneur and non-tribal member who owned the MacFarlane Group along with some other companies that participated in the illegal lending scheme.

48.     As early as 2009, Curry associated the MacFarlane Group with the Otoe-Missouria Tribe, in a scheme to avoid state usury law. While the Tribe held itself out as the lender, the MacFarlane Group provided the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: marketing, lead generation, technology platforms, payment processing servicing and collection procedures.

49.     The Tribe received a flat fee of 1 percent of the revenue from the illegal lending.

50.     After paying expenses and investors, Curry, through the MacFarlane Group, received the remaining revenue from the loans.

51.     The Tribe had no control over the income or expenses of American Web Loan. Zeke Faux, *Payday Lenders Find Home on Indian Reservations*, Bloomberg News (Nov. 30, 2014).

52.     Tribal members did not participate in the day-to-day operations of American Web Loan and many of the activities associated with the lending occurred outside of the Tribe's reservation. Most of the lending activities performed on behalf of American Web Loan were performed by non-tribal officers and employees of the MacFarlane Group.

53.     The MacFarlane Group and Curry controlled the bank account that provided the money to fund Plaintiffs' loans, and all payments on the loans went to the MacFarlane Group and Curry.

54.     In the past few years, regulators have begun cracking down on rent-a-tribe arrangements.

55.     In 2013, the New York Department of Financial Services issued a cease and desist order to the Tribe, requesting that the Tribe cease providing loans to New York residents.

56.     In response, the Tribe filed a lawsuit seeking a preliminary injunction against the New York Department of Financial Services. The district court denied the motion for preliminary injunction and the Second Circuit affirmed the decision, finding that the loans were subject to New York's anti-usury laws. *See Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105 (2d Cir. 2014).

57.     The Federal Trade Commission also brought suit against a similar rent-a-tribe scheme operated by Scott Tucker and Timothy Muir. The FTC obtained a $1.3 billion dollar judgment, and Tucker and Muir were convicted in the Southern District of New York on racketeering charges.[3]

58.     Just like Tucker and Muir, Defendants' business relationship with the Tribe was nothing more than an attempt to mislead consumers and regulators by creating the illusion that the Defendants were protected by tribal immunity.

59.     After several of these rent-a-tribe schemes were uncovered through private lawsuits and governmental enforcement actions against Defendants' competitors, the MacFarlane Group was sold and merged with tribal entity Red Stone in an effort to further insulate the scheme from liability. Red Stone operates in the same manner and is run by the same individuals as the MacFarlane Group.

60.     Medley Capital, through the Medley Fund, provided capital to fund the loans and worked with Curry and the other entities to engage in illegal lending.

61.     Medley Fund provided capital to the MacFarlane Group, which then used that money to fund the loans made by American Web Loan.

---

[3] *See* https://www.ftc.gov/news-events/blogs/business-blog/2016/10/record-13-billion-ruling-against-scott-tucker-others-behind; https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday.

62.     From December 2011 to at least June 2016, Medley Fund provided at least tens of millions of dollars to the MacFarlane Group to fund the illegal loans.

## PLAINTIFFS' EXPERIENCES

### A. Plaintiff John Glatt (Virginia)

63.     On or around April 2017 and October 2017, Mr. Glatt obtained loans for $600 and $300 with American Web Loan.

64.     The interest rates on all Mr. Glatt's loans exceeded what is allowed under Virginia law.  For example, Mr. Glatt's April 2017 loan had an interest rate in excess of 500%.

65.     Mr. Glatt paid no less than $1,552.07 on his loans with American Web Loan.

66.     As part of his application, Mr. Glatt entered in his Virginia residential address.

### B. Plaintiff Sonji Grandy (New Jersey)

67.     On or around February 2015, December 2015, and November 2017, Ms. Grandy took out loans from American Web Loan for $700, $500, and $300 respectively.

68.     The interest rates on all the loans exceeded what is allowed under New Jersey law.  For example, Ms. Grandy's November 2017 loan carried an interest rate of 668.44%.

69.     Ms. Grandy has paid in excess of $3,500 on her loans from American Web Loan.

70.     As part of her application, Ms. Grandy entered in her New Jersey residential address.

### C. Plaintiff Heather Ball (New Jersey)

71.     On or about April 8, 2018, Ms. Ball obtained a loan with American Web Loan. The principal amount was $1,500 and the interest rate was 559%.

72.     Ms. Ball paid no less than $2,216.46 on her loan with American Web Loan.

73.     As part of her application, Ms. Ball entered in her New Jersey residential address.

### D.  Plaintiff Dashawn Hunter (Illinois)

74.     On or around July 19, 2017, while living in Illinois, Ms. Dashawn Hunter took out her first loan from American Web Loan.  The principal amount on the loan was $600.00 and the loan required bi-weekly payments of $193.21.  Ms. Hunter paid off this loan in full, paying well above the original principal balance on the loan.

75.     On or around January 23, 2018, still while living in Illinois, Ms. Hunter took out a second loan from American Web Loan.  The principal amount on the loan was $400.00, the interest rate was 595.22%, and the loan required 13 bi-weekly payments of about $99.93.  Ms. Hunter has paid at least $1,199.16 on this loan.

76.     The interest rates on all of Ms. Hunter's loans exceeded those allowed by applicable law.

77.     As part of the applications, Ms. Hunter entered in her Illinois residential address.

### E.  Plaintiff Michael Corona (Pennsylvania)

78.     On or around December 1, 2015, while living in Pennsylvania, Mr. Corona took out his first loan from American Web Loan.  The principal amount on the loan was $800.00 and the interest rate was 705.75%. The loan required 16 bi-weekly payments of at least $228.00.  Mr. Corona paid at least $3,764.00 to American Web Loan for repayment on the first loan.

79.     On or around June 22, 2016, while still living in Pennsylvania, Mr. Corona took out his second loan from American Web Loan.  The principal amount on this loan was $600.00, and the loan required bi-weekly payments of about $165.60.

80.     Mr. Corona also took out a third loan with American Web Loan on February 3, 2017, while living in Pennsylvania.  The principal amount on the loan was $700.00, and the loan required bi-weekly payments of about $201.25.

81.     The interest rates on all of Mr. Corona's loans exceeded those allowed by applicable law.

82.     Mr. Corona paid off all three loans in full, paying well above the original principal balance on each loan.

## CLASS ACTION ALLEGATIONS

83.     Plaintiff Glatt asserts his Virginia claims on behalf of the proposed Virginia Class defined as follows:

> *All individuals located in Virginia who entered into a loan agreement with American Web Loan and paid any amounts on the loan.*

84.     Plaintiffs Grandy and Ball assert their New Jersey claims on behalf of the proposed New Jersey Class defined as follows:

> *All individuals located in New Jersey who entered into a loan agreement with American Web Loan and paid any amounts on the loan.*

85.     Plaintiff Hunter asserts her Illinois claims on behalf of the proposed Illinois Class defined as follows:

> *All individuals located in Illinois who entered into a loan agreement with American Web Loan and paid any amounts on the loan.*

86.     Plaintiff Corona asserts his Pennsylvania claims on behalf of the proposed Pennsylvania Class defined as follows:

*All individuals located in Pennsylvania who entered into a loan agreement with American Web Loan and paid any amounts on the loan.*

87.     Plaintiffs also assert claims on behalf of the nationwide proposed RICO Class defined as follows:

*All individuals located in Virginia, Illinois, New Jersey, Pennsylvania, or states with similar laws who entered into a loan agreement with American Web Loan.*

**Numerosity**

88.     At this time, Plaintiffs do not know the exact number of members of the Classes; however, given the volume of Defendants' business, there are likely thousands of members of each Class. Thus, the Classes are so numerous that joinder of all members is impracticable.

**Commonality**

89.     There are numerous common questions of law and fact common to Plaintiffs and members of the Classes. These questions include but are not limited to the following:

a.      Whether Defendants violated state usury laws;

b.      Whether Defendants are protected by tribal sovereign immunity;

c.      Whether Defendants engaged in unfair or deceptive acts or practices;

d.      Whether Defendants, the tribal officials, and others unknown to Plaintiffs, constitute an "enterprise" under RICO;

e.      Whether Defendants conducted the affairs or participated in the enterprise's affairs;

f.      Whether Defendants violated RICO by charging interest rates more than twice the legal limit under state law;

g.      The proper measure and amount of damages for the Classes.

**Typicality**

90.      Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Each Plaintiff, like members of the Classes, took out a usurious loan from Defendants. Thus, Plaintiffs' claims, like the claims of the Classes, arise out of the same common practices of conduct by Defendants and are based on the same legal and remedial theories.

**Adequacy**

91.      Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience in litigating "rent-a-tribe" cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel has interests that conflict with the Classes.

**Injunctive Relief**

92.      The Classes meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole. Prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants.

**Predominance and Superiority**

93.     The Classes meet the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Classes even though certain members of the Classes are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

a.      Absent a class action, Class members as a practical matter will be unable to obtain redress; Defendants' violations will continue without remedy; and additional consumers will be harmed.

b.      It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions.

c.      A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

d.      The lawsuit presents no difficulties that would impede its management by the Court as a class action.

e.      Defendants have acted on grounds generally applicable to Class members, making class-wide relief appropriate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### RICO, 18 U.S.C. § 1962(a)
**(On Behalf of All Plaintiffs and the RICO Class Against Medley Fund and Medley Capital)**

94.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

95.     All of the loans made to Virginia, Illinois, New Jersey, and Pennsylvania residents and residents of similar states included an interest rate far in excess of twice the applicable enforceable rate and, thus, the loans constitute "unlawful debt" under RICO. 18 U.S.C. § 1961(6).

96.     Curry, MacFarlane Group, American Web Loan, Red Stone, Medley Capital, Medley Fund, and unnamed Tribal officials and executives and officers of Defendants constitute an "enterprise" under RICO.

97.     As alleged above, Medley Capital and Medley Fund violated § 1962(a) of RICO through the receipt of income derived, directly and indirectly, from the collection of unlawful debt; and through the use and reinvestment of parts of such income to acquire interests in and to further establish and assist the operations of the enterprise.

98.     Medley Capital and Medley Fund participated in the collection of the unlawful debt as principals by aiding, abetting, procuring proceeds from the enterprise, and willfully investing money for the purpose of the unlawful scheme.

99.     Plaintiffs and the Class members were injured as a result of Medley Capital's and Medley Fund's violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for their investment and participation in the enterprise.

100.    Accordingly, Medley Capital and Medley Fund are jointly and severally liable to Plaintiffs and the Class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**SECOND CAUSE OF ACTION:**
**RICO, 18 U.S.C. § 1962(b)**

**(On Behalf of All Plaintiffs and the RICO Class Against All Defendants)**

101.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

102.    Curry, MacFarlane Group, American Web Loan, Red Stone, Medley Capital Medley Fund, and unnamed Tribal officials and executives and officers of Defendants constitute an "enterprise" under RICO.

103.    As alleged above, Defendants violated § 1962(b) of RICO by acquiring and maintaining interests in, and control of, the enterprise involved in the unlawful collection of debt.

104.    Defendants participated in the collection of the unlawful debt as principals by aiding, abetting, procuring proceeds from the enterprise, and by willfully acquiring and maintaining interests in and control of the enterprise.

105.    Plaintiffs and the RICO Class Members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

106.    As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the Class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

### THIRD CAUSE OF ACTION:
### RICO, 18 U.S.C. § 1962(c)
**(On Behalf of All Plaintiffs and the RICO Class against Curry, American Web Loan, AWL, and Red Stone)**

107.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

108.    Curry, MacFarlane Group, American Web Loan, Red Stone, Medley Capital, Medley Fund, and unnamed Tribal officials and executives and officers of Defendants constitute an "enterprise" under RICO.

109.    All of the loans made to Virginia, Illinois, New Jersey, and Pennsylvania residents and residents of similar states included an interest rate far in excess of twice the applicable enforceable rate.

110.    As alleged above, Curry, MacFarlane Group, American Web Loan and AWL associated with the enterprise and participated in the affairs of the enterprise, which existed for the purpose of collection of unlawful debt.

111.    Defendants' participation in the enterprise violated § 1962(c) of RICO and caused Plaintiffs to repay amounts on unlawful loans.

112.    Plaintiffs and the Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

113.    Moreover, Nevada's dissolution laws allow Plaintiffs to bring any claims against MacFarlane Group against Curry and Red Stone. Nev. Rev. Stat. Ann. § 92A.250(1)(c)-(d).

## FOURTH CAUSE OF ACTION:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
### (On Behalf of All Plaintiffs and the RICO Class Against All Defendants)

114.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

115.    Curry, MacFarlane Group, American Web Loan, Red Stone, Medley Capital Medley Fund, and unnamed Tribal officials and executives and officers of Defendants constitute an "enterprise" under RICO.

116.     As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to conspire to violate §§ 1962(a)-(c), including but not limited to: (1) the original agreement between MacFarlane Group and American Web Loan whereby 1% of the revenue would be provided to the Tribe in return for the use of its name, (2) the merger agreements between MacFarlane Group and Red Stone, and (3) the loan agreements whereby Medley Fund and Medley Capital agreed to provide $30 million dollars of financing for the loans.

117.     Plaintiffs and the Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

### FIFTH CAUSE OF ACTION
**Violation of Virginia Usury Laws**
**(On behalf of Plaintiff Glatt and the Virginia Class)**

118.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

119.     Under Virginia law, the maximum allowable interest rate on a consumer loan is 12% per annum. Va. Code § 6.2-303.

120.     All of the loans made to Virginia consumers in the name of American Web used an annual interest rate well in excess of 12%.

121.     As a result, Plaintiff and the Virginia Class are entitled to recover all amounts paid on these void loans, as well as twice the amount of usurious interest paid. Va. Code § 6.2-1541(B); Va. Code § 6.2-305.

### SIXTH CAUSE OF ACTION
**Violation of New Jersey Usury Laws**
**(On behalf of Plaintiffs Grandy and Ball and the New Jersey Class)**

122.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

123.     The maximum interest rate chargeable to consumers under New Jersey law is 16%. N.J. Stat. § 31:1-1(a).

124.     All of the loans made to Plaintiffs and the New Jersey Class were in excess of the maximum rates allowed under New Jersey law.

125.     Defendants' conduct in doing so was knowing, deliberate, intentional, and willful. Defendants' purpose was to take more than the legal rate of interest for the money loaned to Plaintiff and members of the Six Year Class.

126.     Under N.J. Stat. § 31:1-4, Plaintiff and members of the Six Year Class are entitled to a declaration that their loans are unlawful and usurious, and restitution of all amounts paid to Defendants in excess of the principal amount, plus the costs of bringing this action.

### SEVENTH CAUSE OF ACTION
**Violation of New Jersey Consumer Finance Leasing Act**
**(On behalf of Plaintiffs Grandy and Ball and the New Jersey Class)**

127.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein

128.     Defendants are or were "consumer lenders" as that term is defined by the Consumer Finance Leasing Act ("CFLA"). N.J. Stat. § 17:11C-2.

129.     Defendants are or were engaged in the "consumer loan business" as that term is defined by the CFLA. N.J. Stat. § 17:11C-2.

130.     All of the loans made to Plaintiffs and the New Jersey Class were in excess of the maximum rates allowed under New Jersey law.

131.    Defendants' loans to Plaintiffs and members of the New Jersey Class were "consumer loans" as that term is defined by the CFLA. N.J. Stat. § 17:11C-2.

132.    The CFLA requires that consumer lenders must be licensed in the State of New Jersey. N.J. Stat. § 17:11C-3. The CFLA also provides that anyone engaged in business as a consumer lender who is not licensed is "guilty of a crime of the fourth degree." N.J. Stat. § 17:11C-33(b). The act further provides that loans made by unlicensed lenders "shall be void and the lender shall have no right to collect or receive any principal, interest or charges unless the act was the result of a good faith error…." *Id.* In addition, the CFLA provides that "a consumer lender who knowingly and willfully violates any provision of this act shall also forfeit to the borrower three times any amount of the interest, costs or other charges collected in excess of that authorized by law." *Id.*

133.    At no time were Defendants licensed to make consumer loans or to collect or receive payments on consumer loans in the State of New Jersey. As a result, the conduct at issue herein is not merely unlawful; it is criminal.

134.    Defendants' conduct was not the result of a good faith error but instead was a deliberate, willful, and intentional scheme to circumvent New Jersey law and to collect interest at rates well in excess of that allowed under the law. Plaintiffs and members of the New Jersey Class are entitled to a declaration that such loans are void.

135.    In addition, Defendants have no right to any principal, interest, or charges on the loans, and Plaintiffs and members of the New Jersey Class are entitled to restitution of all amounts paid to Defendants, plus forfeiture of three times of the amounts of interest, costs, or other charges collected by Defendants in excess of that authorized by law.

**EIGHTH CAUSE OF ACTION**
**Violations of New Jersey Consumer Fraud Act**

**(On behalf of Plaintiffs Grandy and Ball and the New Jersey Class)**

136.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein..

137.     The New Jersey Consumer Fraud Act ("CFA") prohibits, among other things, the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission of any material fact … in connection with the sale or advertisement of any merchandise." N.J. Stat. § 56:8-2. The requirements of the CFA extend to the offering, sale, or provision of consumer credit.

138.     Defendants' unlawful, criminal consumer lending practices constitute "unconscionable commercial practices" within the meaning of the CFA.

139.     Defendants' conduct caused an ascertainable loss to Plaintiffs and members of the New Jersey Class by, among other things, forcing Plaintiffs and members of the New Jersey Class to pay excessive, unlawful, unconscionable, and usurious rates of interest on consumer loans.

140.     As a result of Defendants' knowing and willful violations of the CFA, Plaintiffs and members of the New Jersey Class are entitled to an award of threefold their actual damages, plus reasonable attorneys' fees and costs.

### NINTH CAUSE OF ACTION
**Violation of Illinois Consumer Installment Loan Act - 205 Ill. Comp. Stat. 670/1, et. seq.**
**(On behalf of Plaintiff Hunter and the Illinois Class)**

141.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein..

142.    Under the Illinois Consumer Installment Loan Act, a "'[s]mall consumer loan'" means a loan upon which interest is charged at an annual percentage rate exceeding 36% and with an amount financed of $4,000 or less.  205 ILCS 670/15.

143.    Small consumer loan lenders are required to be licensed to make loans.  205 ILCS 670/1.

144.    If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."  205 ILCS 670/20(d).

145.    Defendants violated Illinois law by charging interest rates making small consumer loans without a license and charging interest rates far in excess of those permitted to licensed

146.    As a result of these unlawful loans, Plaintiff Hunter and the Illinois Class are entitled to recover damages, attorneys' fees, and costs pursuant to 205 ILCS 670/20(b); 205 ILCS 670/20.7.

### TENTH CAUSE OF ACTION
### Violation of Illinois Consumer Fraud Act – 815 ILCS 505/2
### (On behalf of Plaintiff Hunter and the Illinois Class)

147.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

148.    Defendants, in the course of trade or commerce, engaged in unfair acts and practices, in violation of 815 ILCS 505/2, by contracting for and collecting finance charges, interest, and fees, from Illinois residents, in excess of the amounts permitted by Illinois law.

149.    These unlawful charges caused actual damages to Plaintiff Hunter and the Illinois Class.

150.    Pursuant to 815 ILCS 505/10a, Plaintiff Hunter and the Illinois Class seeks damages for all amounts paid to Defendants, injunctive relief, and attorneys' fees and costs.

## ELEVENTH CAUSE OF ACTION
### Violation of Pennsylvania Usury Law – 41 Pa. Stat. § 101 *et seq.*
### (On behalf of Plaintiff Corona and the Pennsylvania Class)

151.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.Defendants, through the operations and conduct described above, were or are in the business of arranging, funding, and servicing credit in the amount of $50,000 or less, and are subject to the provisions of the Pennsylvania Consumer Discount Company Act ("CDCA"), 7 Pa. Stat. §§ 201 *et seq.*

152.    Because Defendants failed to obtain a license under the CDCA, the interest rates applicable to the subject payday loan transactions can be no higher than that set by the general Pennsylvania usury law under the Loan Interest and Protection Law ("LIPL") —six percent (6%) annual percentage rate. 41 Pa. Stat. §§ 201 *et seq.*

153.    By charging and collecting interest at a rate higher than that permitted by law, Defendants violated the LIPL, 41 Pa. Stat. §§ 201, 501.  The LIPL's protections cannot be waived. 41 Pa. Stat. § 408.

154.    Plaintiff and Class members are entitled to triple the amount of excess interest they have paid on the subject payday loans, together with reasonable attorneys' fees and costs, pursuant to 41 Pa. Stat. §§ 502-503.

155.    Plaintiffs and Class members also are entitled to a declaratory judgment that the subject payday loans violate Pennsylvania's usury law, as well as an injunction prohibiting Defendants from arranging, funding, and/or servicing usurious payday loans in Pennsylvania.

## TWELFTH CAUSE OF ACTION
### Violation of Pennsylvania Fair Credit Extension

**Uniformity Act – 73 Pa. Stat. § 2270.1 *et seq.***
**(On behalf of Plaintiff Corona and the Pennsylvania Class)**

156.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

157.     By collecting and attempting to collect interest charges that are not permitted by law, giving a false representation of the legal status of the alleged debt, and making threats to take action which cannot legally be taken, Defendants violated the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), 73 Pa. Stat. §§ 2270.1 *et seq.*

158.     As a result of this unlawful conduct, Plaintiff Corona and the Pennsylvania Class are entitled to recover damages, injunctive relief, attorneys' fees, and costs pursuant to the UTPCPL, 73 Pa. Stat. § 201.9.2(a).

**THIRTEENTH CAUSE OF ACTION**
**Violation of Pennsylvania Unfair Trade Practices and**
**Consumer Protection Law – 73 Pa. Stat. §§ 201-1 *et seq.***
**(On behalf of Plaintiff Corona and the Pennsylvania Class)**

159.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

160.     Defendants' violation of the CDCA constitutes a *per se* unfair or deceptive act or practice under the UTPCPL.

161.     Defendants' violations of the FCEUA, 73 Pa. Stat. §§ 2270.1 *et seq.*, as described above, constitute *per se* unfair or deceptive trade practices under the UTPCPL, pursuant to FCEUA, 73 PA. Stat. § 2270.5(a)

162.     As a result of this unlawful conduct, Plaintiff Corona and the Pennsylvania Class are entitled to recover damages, injunctive relief, attorneys' fees, and costs pursuant to the UTPCPL, 73 Pa. Stat. § 201.9.2(a).

## FOURTEENTH CAUSE OF ACTION
### Unjust Enrichment
**(On behalf of Plaintiffs and the Virginia, Illinois, New Jersey, and Pennsylvania Classes)**

163.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

164.    Plaintiffs and Class members conferred a benefit on Defendants when they made payments on loans that were void or made payments of interest beyond the amounts legally collectible under state law. To the detriment of Plaintiffs and Class members, Defendants have been, and continue to be, unjustly enriched as a result of charging and collecting illegal, usurious interest rates from residents of Virginia, Illinois, New Jersey, and Pennsylvania. As between the parties, it would be unjust for Defendants to retain the benefits attained by their actions. Accordingly, Plaintiffs seek a full accounting and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A.    An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2), and (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B.    An Order declaring that Defendants are financially responsible for notifying Class members of the pendency of this suit;

C.    An Order declaring that Defendants committed the violations of law alleged herein;

D.    An Order providing for any and all injunctive relief the Court deems appropriate;

E.    An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F.    An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

G.    An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

H.    An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

I.    Such further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

RESPECTFULLY SUBMITTED AND DATED this 9th day of August, 2018.

/s/

Leonard A. Bennett, VSB #37523
Elizabeth W. Hanes, VSB #75574
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, Virginia 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
elizabeth@clalegal.com

Kristi Cahoon Kelly, VSB #72791
Andrew Guzzo, VSB #82170
**KELLY & CRANDALL, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email:kkelly@ kellyandcrandall.com
aguzzo@kellyandcrandall.com

E. Michelle Drake
John G. Albanese
**BERGER & MONTAGUE, P.C.**
43 SE Main Street, Suite 505
Minneapolis, Minnesota 55414
Telephone: (612) 594-.5999
Facsimile: (612) 584-4470
Email:emdrake@bm.net
jalbanese@bm.net

Beth E. Terrell
Elizabeth A. Adams
**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450
Email:bterrell@terrellmarshall.com
eadams@terrellmarshall.com

Matthew Wessler
**GUPTA WESSLER PLLC**
1735 20th Street, NW
Washington, D.C. 20009
Telephone: (202) 888-1741
Facsimile: (202) 888-7792
Email: matt@guptawessler.com

*Attorneys for Plaintiffs and Proposed Classes*